UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| BRANDON CALLIER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | EP-20-CV-00318-FM |
| | § | |
| MULTIPLAN, INC., NATIONAL | § | |
| CONGRESS OF EMPLOYERS, | § | |
| INC., HEALTH PLAN | § | |
| INTERMEDIARIES HOLDINGS, | § | |
| LLC, and AMERICAN FINANCIAL | § | |
| SECURITY LIFE INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT (ECF No. 25; ECF No. 26)

Before the court are:

- "Defendant American Financial Security Life Insurance Co.'s Motion to Dismiss Plaintiff's First Amended Complaint, Or In The Alternative, Motion to Stay" ("AFSLIC's Motion to Dismiss") [ECF No. 25], filed on March 23, 2021, by Defendant American Financial Security Life Insurance Company ("AFSLIC") and "National Congress of Employers, Inc. [sic] Motion To Join In American Financial Security Life Insurance Co.'s Motion to Dismiss First Amended Complaint" ("NCE's Motion to Join") [ECF No. 41], filed on May 13, 2021, by Defendant National Congress of Employers, Inc. ("NCE");

- "Defendant Health Plan Intermediaries Holdings, LLC's Motion to Dismiss For Lack of Subject-Matter Jurisdiction And For Failure to State A Claim Upon Which Relief Can Be Granted" ("Health Plan's Motion to Dismiss") [ECF No. 26], filed on March 24, 2021, by Defendant Health Plan Intermediaries Holdings, LLC ("Health Plan") and "Multiplan's Motion To Join In Health Plan Intermediaries Holdings, LLC's Motion To Dismiss For Lack Of Subject Matter Jurisdiction And For Failure To State A Claim Upon Which Relief Can Be Granted" ("MultiPlan's Motion to Join") [ECF No. 27], filed on March 24, 2021, by Defendant MultiPlan, Inc. ("MultiPlan");

- "Plaintiff's Response To Defendant Health Plan Intermediaries Holdings, LLC's Motion to Dismiss For Lack of Subject-Matter Jurisdiction And For Failure to State A Claim

Upon Which Relief Can Be Granted" ("Response") [ECF No. 30], filed on March 31, 2021, by Plaintiff Brandon Callier ("Plaintiff"); and

- "Defendants Health Plan Intermediaries Holdings, LLC and Multiplan, Inc.'s Reply to Plaintiff's Response to Defendant's Motion To Dismiss" ("Reply") [ECF No. 31], filed on April 7, 2021, by Defendants Health Plan and MultiPlan.

Defendants move to dismiss "Plaintiff's First Amended Complaint" ("Complaint") [ECF No. 21], filed on March 9, 2021, by Brandon Callier ("Plaintiff"), for lack of subject-matter jurisdiction, lack of personal jurisdiction, and because it fails to state a claim upon which relief may be granted. Plaintiff opposes the motions.[1] After careful consideration, the court **GRANTS IN PART and DENIES IN PART** the motions to dismiss as set forth herein.

## I.    BACKGROUND

### A.    Factual Background[2]

This case arises from a series of unwanted robocalls that Plaintiff received on his cellphone from a group of businesses seeking to sell Plaintiff certain insurance products and services.[3] Between October 2019 and December 2020, Plaintiff received at least nine automated calls on his cell phone, each originating from a "spoofed" phone number.[4] Plaintiff did not consent to these calls and had no prior business relationship with Defendants.[5]

---

[1] Plaintiff did not directly respond to AFSLIC's Motion to Dismiss.

[2] All facts described in this section are taken as true from the allegations in "Plaintiff's First Amended Complaint" ("Compl."), ECF No. 21, filed on March 9, 2021. *See Arnold v. Williams*, 979 F.3d 262 n.1 (5th Cir. 2020).

[3] *See generally* Compl. ¶¶ 29–57. The Complaint does not make clear what goods and services were being marketed. For example, at different points in his Complaint, Plaintiff describes health insurance policies, medical discount cards, and an insurance marketplace known as "MyBenefitsKeeper." *See id.* ¶¶ 41, 36, 55, 59. Also, Plaintiff does not identify which Defendants were acting as telemarketers and/or lead generators and which Defendants actually sell insurance products and services.

[4] *Id.* ¶¶ 31–45, 50. According to the Federal Communications Commission ("FCC"), "[s]poofing is when a caller deliberately falsifies the information transmitted to your caller ID display to disguise their identity." FCC, Caller ID Spoofing, https://www.fcc.gov/spoofing (last accessed Aug. 17, 2021).

[5] Compl. ¶ 49.

Every time he answered, Plaintiff heard a prerecorded message advertising undisclosed insurance product without identifying who was responsible for the calls.[6]  Plaintiff was unable to stop the calls.[7]  Eventually, Plaintiff answered one of the robocalls calls and purchased an insurance policy that he did not want or need solely to determine who was responsible for the calls.[8]  Even after buying an insurance policy, Defendants kept calling, continuing to peddle their goods and services.[9]

Plaintiff did not want to be called, did not ask to be called, and had no desire to hear Defendants' offer.[10]  In fact, Plaintiff's cell phone number has been registered on the national Do-Not-Call list since December 13, 2007.[11]  Despite asking Defendants to stop contacting him, the calls continued.[12]

Plaintiff argues that Defendants use automated dialing technology to place robocalls en masse, rather than identifying and targeting interested prospective customers.[13]  Defendants hide behind third-party telemarketers and spoofed phone numbers to conceal their identities.[14]  Moreover, Defendants call numbers registered on the national Do-Not-Call registry, such as Plaintiff's cell phone.  They do not maintain an internal do-not-call list to avoid calling

---

[6] Compl. ¶¶ 31–44.

[7] *See id.* ¶ 48.

[8] *Id.* ¶ 36.

[9] *See id.* ¶ 41.

[10] *Id.* ¶ 36.

[11] *Id.* ¶ 29.

[12] *See id.* ¶¶ 31–44.

[13] *See id.* ¶¶ 46–48.

[14] *Id.* ¶ 50.

individuals, like Plaintiff, who do not wish to receive these calls.[15]  Defendants are on notice about their unlawful sales practices based on the number of robocalling-related complaints that people have filed against Defendants with the "Better Business Bureau."[16]

Plaintiff contends these calls violate the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227 *et seq.*, the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310 *et seq.*, and the Texas Business & Commerce Code, § 302.101 *et seq.*[17]

### B.    Procedural Background

Plaintiff filed his amended Complaint on March 9, 2021.  Therein, Plaintiff asserted the following claims: (1) Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii) of the Telephone Consumer Protection Act of 1991 ("TCPA") by using an automated telephone dialing system ("ATDS") to call Plaintiff without his consent; (2) Defendants violated 47 U.S.C. § 227(c) of the TCPA by calling Plaintiff's cell phone, even though it is on the Do-Not-Call registry; (3) Defendants violated 16 C.F.R. § 310.4(b)(1)(iii)(B) of the TSR by calling Plaintiff's cellphone, even though it is on the Do-Not-Call registry; (4) Defendants violated § 302.101 of the Texas Business & Commerce Code by engaging in telephone solicitation without obtaining a registration certificate; and (5) Defendants violated § 305.053 of the Texas Business & Commerce Code, which is a state counterpart to § 227(b) of the TCPA.[18]

Plaintiff avers Defendants are directly liable for these actions and vicariously liable under theories of actual authority, apparent authority, and ratification.[19]  Even though Plaintiff does not

---

[15] *Id.* ¶¶ 29, 36, 53–54.

[16] *See id.* ¶ 47.

[17] *Id.* ¶¶ 64–90.

[18] *Id.*

[19] *Id.* ¶ 58.

know which Defendants authorized the robocalls and which Defendants made the robocalls, he contends all defendants are vicariously liable because they are aware of the unlawful practices and have benefited from these practices.[20]

On the other hand, AFSLIC challenges the sufficiency of Plaintiff's claims.  It argues that Plaintiff impermissibly lumps the Defendants together "without specifying the role of each Defendant" in violation of the federal pleading standards.[21]  Also, Plaintiff fails to adequately plead agency relationship that could support vicarious liability between the Defendants, as Plaintiff does not allege "which Defendant is the principal" or which Defendant, if any, was acting on behalf of the unnamed principals.[22]

Concerning the TCPA claims, AFSLIC argues Plaintiff has not pleaded facts that would suggest an ATDS "was used in placing the purported calls at-issue," a necessary element for TCPA liability.[23]  AFSLIC further contends Plaintiff's claim under the TSR fails because Plaintiff has not satisfied the amount-in-controversy requirement the statute imposes.[24]  Regarding the state law claims, AFSLIC claims § 302.101 expressly exempts insurance companies, like itself, and that the state claims suffer from the same pleading defect as Plaintiff's TCPA claims.[25]  Finally, AFSLIC contends subject-matter jurisdiction is lacking over calls made

---

[20] *See id.* ¶¶ 59–61.

[21] "Def. American Financial Security Life Insurance Co.'s Mot. to Dismiss Pl.'s First Am. Compl., Or In The Alternative, Mot. to Stay" ("AFSLIC's Mot. to Dismiss") 8, ECF No. 25, filed Mar. 23, 2021.

[22] *Id.* at 11.

[23] *Id.* at 10.

[24] *Id.* at 12.

[25] *Id.*  Health Plan and MultiPlan also contend they are exempt for this registration requirement.

before July 2020, citing *Barr v. Am. Ass'n of Political Consultants, Inc.* ("AAPC"), 140 S. Ct. 2335 (2020).[26]

NCE joined AFSLIC's Motion to Dismiss and endorses the arguments raised therein.[27] Additionally, NCE claims personal jurisdiction is lacking because "Plaintiff has failed to draw any link between the alleged acts of NCE and the forum state of Texas."

Health Plan and MultiPlan move for dismissal, albeit for different reasons.[28]  First, Plaintiff lacks standing to sue under the TCPA because he uses his cell phone for business purposes and is a prolific filer of TCPA lawsuits.[29]  Second, the TCPA claims fail as a matter of law because that statute does not protect calls placed to cell phones but instead protects against unwanted calls placed to a residential telephone number.[30]  Third, Plaintiff's claims under the TCPA, TSR, and Texas law must fail because Plaintiff expressly consented to receive Defendants' calls.[31]  Health Plan included external documentation supporting this claim and respectfully moves the court to consider matter outside the pleadings in finding that Plaintiff consented to the robocalls.[32]

---

[26] AFSLIC's Mot. to Dismiss 2–3.  Additionally, AFSLIC requested a stay pending the Supreme Court's decision in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021).  AFSLIC's Mot. to Dismiss 5.  As that opinion was released on April 1, 2021, Defendants' request for a stay is hereby denied as moot.

[27] "National Congress of Employers, Inc. [sic] Mot. To Join In American Financial Security Life Insurance Co.'s Mot. to Dismiss First Am. Compl." ("NCE's Motion to Join") ECF No. 41, filed May 13, 2021.

[28] *See generally* "Def. Health Plan Intermediaries Holdings, LLC's Mot. to Dismiss For Lack of Subject-Matter Jurisdiction And For Failure to State A Claim Upon Which Relief Can Be Granted" ("Health Plan's Motion to Dismiss"), ECF No. 26, filed Mar. 24, 2021.

[29] *Id.* at 5.

[30] *Id.* at 11.

[31] *See id.* at 13–18.

[32] *Id.* ¶¶ 28–30.

## II.    LEGAL STANDARDS

### A.    Pleading Standards

Federal Rule of Civil Procedure Rule 12(b)(6) allows dismissal of a complaint for "failure to state a claim for which relief can be granted."[33]  "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief."[34]  To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[35]

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[36]  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[37]  A complaint need not include "detailed factual allegations," but it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."[38]  Thus, although the court must accept well-pleaded allegations in a complaint as true, it does not afford conclusory allegations similar treatment.[39]

---

[33] Fed. R. Civ. P. 12(b)(6).

[34] *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[35] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

[37] *Id.*

[38] *Twombly*, 550 U.S. at 555.

[39] *See Kaiser Aluminum & Chem. Sales, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (citing *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).

Courts should construe the pleadings and briefs of pro se litigants liberally, applying less stringent standards than those reserved for counsel.[40]  Nevertheless, like represented parties, pro se litigants must adequately plead facts that, when liberally construed, state a plausible claim to relief.[41]

### B.    Personal Jurisdiction

Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss claims if it lacks personal jurisdiction over the defendant.[42]  Personal jurisdiction exists where the forum state's long-arm statute extends to the nonresident defendant, and the exercise of jurisdiction comports with due process.[43]

In Texas, courts evaluate personal jurisdiction over nonresident defendants through a two-step inquiry, ensuring compliance with the state's long-arm statute and the Due Process Clause of the Fourteenth Amendment.[44]  The Texas long-arm statute is coextensive with the constitutional limits of due process.[45]  Though personal jurisdiction can be general or specific,

---

[40] *Andrade v. Gonzales*, 459 F.3d 538, 543 (5th Cir. 2006); *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995).

[41] *See EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014); *Grant*, 59 F.3d at 524; *see also Barker v. Norman*, 651 F.2d 1107, 1129 n.26 (5th Cir. Unit A July 1981) ("[A] district judge . . . is neither required nor permitted to be counsel for any party, whether that party is appearing pro se or through counsel.").

[42] *See* Fed. R. Civ. P. 12(b)(2).

[43] *Def. Distributed v. Grewal*, 971 F.3d 485, 490 (5th Cir. 2020).

[44] *Bulkley & Assocs., LLC v. Dep't of Indus. Rels.*, _F.4th _, _, No. 20–40020, 2021 U.S. App. LEXIS 17362, 2021 WL 2374295, at *3 (5th Cir. June 10, 2021) (quoting *id.*).

[45] *Id.*

this case implicates only the latter.[46]  Texas' long-arm statute specifically provides for personal jurisdiction over nonresidents who "do[] business" in Texas or "commit[] a tort" in Texas.[47]

The Fourteenth Amendment's Due Process Clause limits a court's power to exercise personal jurisdiction over a defendant.[48]  The constitutional requirement for specific jurisdiction turns on whether the defendant has sufficient, "minimum contacts" with the forum state, such that "'the maintenance of the suit' is 'reasonable' . . . and 'does not offend traditional notions of fair play and substantial justice.'"[49]  When analyzing whether a court has specific jurisdiction, the Fifth Circuit applies a three-step inquiry:

> 1)     whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there;
> 2)     whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and
> 3)     whether the exercise of personal jurisdiction is fair and reasonable.[50]

It is the plaintiff's burden to establish the court has personal jurisdiction.[51] The burden is carried if the plaintiff makes out a prima facie case supporting jurisdiction.[52]

---

[46] *See* Compl. ¶ 4 ("This Court has personal jurisdiction over Defendants as Defendants conduct business in the State of Texas."); Def. NCE's Mot. to Join 4 ("Plaintiff has failed to draw any link between the alleged acts of NCE and the forum state of Texas.").

[47] *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 17.042).

[48] *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024 (2021).

[49] *Id.* at 233 (quoting *Int'l Shoe Co. v. Washington*, 326 U. S. 310, 316  (1945)).

[50] *Grewal*, 971 F.3d at 490 (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)).

[51] *WNS, Inc. v. Farrow*, 884 F.2d 200, 202 (5th Cir. 1989).

[52] *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

### C.    Subject-Matter Jurisdiction

Federal courts are courts of limited jurisdiction.[53]  They lack the authority to adjudicate cases absent a grant of congressional authority.[54]  As relevant here, Congress authorized federal courts to adjudicate claims "arising under the Constitution, laws, or treaties of the United States."[55]  Moreover, a court may exercise "supplemental jurisdiction over all other claims that" are part of the same "case or controversy" for which original jurisdiction is present.[56]

A plaintiff has the burden of proving the court can exercise subject-matter jurisdiction, although the court may raise the issue *sua sponte* at any time.[57]  A court must dismiss any action if subject-matter jurisdiction is absent.[58]

### D.    Standing

Standing is a necessary component of subject-matter jurisdiction and must be determined before proceeding to the gravamen of an action.[59]  Not every right created by Congress or defined by an executive agency is automatically enforceable in the federal courts.  Article III of the Constitution limits the judicial power to resolve "cases" and "controversies."[60]  The standing

---

[53] *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019).

[54] *Id.*

[55] 28 U.S.C. § 1331.

[56] *See* 28 U.S.C. § 1367(a).

[57] *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

[58] *See* Fed. R. Civ. P. 12(b)(6)(1).

[59] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)

[60] U.S. Const. art. III, §§ 1–2.

doctrine ensures the judicial process is restrained to an appropriate category of cases to ensconce the legislative and executive powers from judicial encroachment.[61]

To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) it suffered an "injury in fact" that is concrete, particularized, and actual or imminent, (2) the defendant caused the injury, and (3) the injury would likely be redressed by the requested judicial relief.[62]  This case implicates only the injury-in-fact requirement.  To establish an injury-in-fact, a plaintiff must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'"[63]

A plaintiff must fall within the zone of interests protected by a statute to have standing.[64] This analysis turns on the provisions and purposes of the statute.  This element is necessary but not sufficient; a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."[65]  That flows from the principle that Congress cannot erase Article III's standing requirement by granting the right to sue to a plaintiff who would not otherwise have standing.[66]

---

[61] *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 798 (2021) (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U. S. 765, 774 (2000)); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.").

[62] *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020).

[63] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

[64] *See Lexmark Int'l v. Static Control Components, Inc.,* 134 S. Ct. 1377, 1388 (2014).

[65] *Thole*, 140 S. Ct. at 1618 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).

[66] *See Spokeo*, 136 S. Ct. at 1548 (quoting *Raines v. Byrd*, 521 U.S. 811, 843 n.3 (1997)).

Consequently, because Congress can only elevate the type of rights that are "traditionally amenable to, and resolved by, the judicial process,"[67] courts must consider the historical practices at common law, alongside Congress' judgment, in determining whether a plaintiff has standing under Article III.[68]

## III.    ANALYSIS

### A.    Jurisdiction

Defendants argue the court lacks personal jurisdiction over NCE and subject-matter jurisdiction over Plaintiff's TCPA claims.  The court addresses these issues before turning to the sufficiency of the Complaint.

#### 1.    Personal Jurisdiction

NCE moves to dismiss Plaintiff's claims under Rule 12(b)(2) for lack of personal jurisdiction.[69]  Specifically, NCE argues that Plaintiff's "conclusory allegation that Defendants conduct business in the State of Texas" cannot establish personal jurisdiction because "Plaintiff has failed to draw any link between the alleged acts of NCE and the forum state of Texas."[70]

Pursuant to Rule 12, a party may move to dismiss any action for a "lack of personal jurisdiction."[71]  A court may not adjudicate a party's interest if personal jurisdiction is lacking.

---

[67] *Uzuegbunam*, 141 S. Ct. at 798 (quotation omitted).

[68] *See, e.g.*, *id.* at 798–800; *Spokeo*, 136 S. Ct. at 1549 (2016) ("[I]t is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.").

[69] *See* Def. NCE's Mot. to Join 4.

[70] *Id.*  NCE is the only defendant that contested personal jurisdiction.

[71] Fed. R. Civ. P. 12(b)(2).

Rule 12 requires certain defenses, such as a lack of personal jurisdiction, be asserted in a defendant's first responsive pleading, or the defense will be waived.[72]  As relevant here, a party waives the personal jurisdiction defense by failing to either "(i) make it by motion under [Rule 12]; or (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course."[73]  As a motion under Rule 12 must generally be served within 21 days after a defendant is served with the summons and complaint, a defendant must assert a personal jurisdiction defense in its first responsive pleading within twenty-one days after receiving service of process.[74]

Defendant NCE failed to timely contest personal jurisdiction and, therefore, waived this defense.  Plaintiff filed and served his Complaint on March 9, 2021.  Defendants had twenty-one days—or until March 30, 2021—to assert a lack of personal jurisdiction.  Defendant NCE did not raise this defense or file any responsive pleading until May 13, 2021—forty-five days after its answer was due.[75]  By failing to assert this argument in a timely manner, Defendant NCE waived it.[76]  Accordingly, the court will not dismiss this action for lack of personal jurisdiction over Defendant NCE.[77]

---

[72] Fed. R. Civ. P. 12(b); *see Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 249 (5th Cir. 2020) ("Thus, lack of personal jurisdiction is waived if a party omits the defense from a Rule 12 motion and the defense was available.").

[73] Fed. R. Civ. P. 12(h)(1)(B).

[74] Fed. R. Civ. P. 12(a)(1)(A)(i).

[75] Defendant NCE did not seek an extension of time to file its Rule 12 motion and has not otherwise sought to excuse its failure to file its motion timely.  *Cf. Cruson*, 954 F.3d at 251.

[76] *Grupo Mex. SAB de CV v. SAS Asset Recovery, Ltd.*, 821 F.3d 573, 575 (5th Cir. 2016) ("After all, it is well established that untimely objections to personal jurisdiction can be waived).

[77] NCE did not seek leave from the court to file its untimely Motion to Join AFSLIC's Motion to Dismiss. NCE was required to answer Plaintiff's allegations within twenty-days after being served.  *See* Fed. R. Civ. P. 12(a)(1)(A).

2.    <u>Standing</u>

Defendants next move to dismiss Plaintiff's TCPA claims for lack of standing.[78]  To have standing, a plaintiff must have suffered an injury in fact that is traceable to the defendant's conduct, which can be redressed through judicial relief.[79]  The traceability and redressability requirements are not at issue.  To carry his burden, Plaintiff must demonstrate an injury-in-fact.[80]

The injury-in-fact requirement ensures that a plaintiff is "adversely affected" or "aggrieved" and it serves to distinguish a person with a direct stake in the outcome from a person with a mere interest in the problem.[81]  To establish an injury in fact, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized."[82]  As the calls were made to Plaintiff's cellphone, there is no suggestion this injury is not particularized.[83]  Thus, the only issue before the court is whether the injury is sufficiently concrete.[84]

Plaintiff alleges the calls violated his privacy.[85]  A harm, such as an invasion of privacy, may be concrete, even though it is intangible.[86]  In determining whether this injury is concrete,

---

[78] HealthPlan's Mot. to Dismiss ¶¶ 12–21.

[79] *Id.*

[80] *See El Paso Cnty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020).

[81] *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 690 n.14 (1973).

[82] *Spokeo*, 136 S. Ct. at 1548.

[83] *See id.* ("For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way.").

[84] *See id.* ("Concreteness . . .  is quite different from particularization.").

[85] *See* Compl. ¶ 46.

[86] *See Spokeo*, 136 S. Ct. at 1549 (2016) ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete.").

"both history and the judgment of Congress" are instructive.[87]  Congress cannot, for example, provide a cause of action to vindicate a purely procedural right.[88]  Under our system of separate powers, Congress may confer standing on an individual provided the statutory harm has a "close relationship" with harm that was "'traditionally' recognized as providing a basis for a lawsuit in American courts."[89]  Whether a statutory violation is sufficiently concrete depends on the statutory text and legislative history.[90]  The court begins by reviewing the statutory text and legislative history before turning to the historical inquiry.[91]

The TCPA prohibits certain telemarketing practices.  It prohibits using an ATDS or an artificial or prerecorded voice" to call "any telephone number assigned to a paging service, cellular telephone."[92]  It also proscribes using "an artificial or prerecorded voice to deliver a message" to "any residential telephone line" without prior consent.[93]  The TCPA also creates a private right of action to enforce these provisions. The act authorizes "[a] person" to bring "an action based on a violation of [the TCPA] or the regulations prescribed [thereunder]" to "enjoin such violation," to "recover for actual monetary loss from such a violation," to "receive $500 in damages for each such violation," or to seek both damages and injunctive relief.[94]

---

[87] *Id.*

[88] *See id.* ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing") (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 488 (2009)).

[89] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2198 (2021) (quoting *Spokeo*, 136 S. Ct. at 1540).

[90] *Lexmark Int'l,* 134 S. Ct. at 1388.

[91] *Cranor v. 5 Star Nutrition, LLC*, 998 F.3d 686, 690 (5th Cir. 2021).

[92] 47 U.S.C. § 227(b)(1)(A).

[93] *Id.* § 227(b)(1)(B).

[94] *Id.* § 227(b)(3).

Defendants contest subject-matter jurisdiction on two grounds.  First, Plaintiff lacks standing under the TCPA because he is a "prolific filer of TCPA lawsuits" and is, therefore, not protected under the statute.[95]  Second, Plaintiff has not experienced the type of injury the TCPA protects against because he uses his cell phone for business purposes.[96]

Although Defendants' arguments have intuitive appeal, they collapse under scrutiny. Plaintiff alleges that Defendants' automated robocalls violated his privacy.[97]  This falls within the ambit of the TCPA and is the type of harm Congress sought to prevent.  As this type of harm was actionable at common law, Plaintiff has alleged a concrete injury in fact and has standing under the TCPA.

The TCPA "generally prohibits robocalls to cell phones and home phones."[98] "Voluminous consumer complaints about abuses of telephone technology . . . prompted Congress to pass the TCPA,"[99] which found that "'unrestricted telemarketing can be an intrusive invasion of privacy' and a 'nuisance.'"[100]

Plaintiff received at least nine unwanted calls from Defendants.[101]  These calls all came from spoofed phone numbers.[102]  The calls were all made for the express purpose of peddling

---

[95] HealthPlan's Mot. to Dismiss 5.

[96] *Id.*

[97] *See* Compl. ¶¶ 63, 72, 78.

[98] *Barr v. Am. Ass'n of Political Consultants* ("AAPC"), 140 S. Ct. 2335, 2343 (2020).

[99] *Mims v. Arrow Fin. Servs.*, LLC, 565 U.S. 368, 370–71 (2012).  In 2019 alone, the federal government received approximately 3.7 million complains about robocalls.  *AAPC*, 140 S. Ct. at 2343.

[100] *Cranor*, 998 F.3d at 690 (quoting Pub. L. No. 102-243, § 2, ¶¶ 5, 10, 105 Stat. 2394, 2394 (1991)).

[101] *See* Compl. ¶ 45.

[102] *Id.* ¶ 50.  Although Plaintiff has not raised this claim, § 227(e) of the TCPA prohibits "caus[ing] any caller identification service to knowingly transmit misleading or inaccurate caller identification information . . ."

Defendants' services and products. For Plaintiff, these calls were persistent, annoying, and intrusive. Not only did they intrude on his privacy, but the calls also interfered with Plaintiff's ability to use his phone.[103] Contrary to Defendants' suggestions, these are the same harms the TCPA guards against, even though the calls were made to Plaintiff's cell phone.

The TCPA "expressly covers" calls placed to cell phones.[104] Section 227(b)(1)(A)(iii) makes it "unlawful for any person" to make a call "to any telephone number assigned to a . . . cellular telephone service" without prior consent.[105] Although it is true that §§ 227(b)(1)(B) and 227(c) regulate calls made to "residential" numbers, Defendants' reading is foreclosed by binding circuit precedent. In *Cranor*, the Fifth Circuit held that the TCPA protects against calls made to cellphones, even though the statute uses the term "residential numbers."[106] Citing § 227(b)(1)(A)(iii), which prohibits calls to cell phones, the *Cranor* panel rejected Defendants' reading, holding that if Congress was exclusively concerned with protecting privacy within the home, as Defendants contend, "it would make little sense to prohibit telemarketing to mobile devices designed for use *outside the home*."[107]

---

This further indicates that Plaintiff's stated harm falls within the type of harms Congress sought to protect against by passing the TCPA.

[103] While these harms are not expressly alleged, they are reasonably inferenced from the facts alleged in the Complaint.

[104] *See Cranor*, 998 F.3d at 690 (quoting § 227(b)(1)(A)(iii)). *But see Callier v. Greensky, Inc.*, No. EP-20-CV-00304-KC, 2021 U.S. Dist. LEXIS 126769, at *14 (W.D. Tex. May 10, 2021) (dismissing a claim under 47 C.F.R. § 64.1200 because the call was placed to a cellphone). While other courts in the Western District of Texas have endorsed Defendants' argument, these decisions are inconsistent with and predated the Fifth Circuit's decision in *Cranor*.

[105] Section 227 also provides an exemption for calls made for emergency purposes. That exception is not at issue in this case.

[106] *Cranor*, 998 F.3d at 691.

[107] *Id.* Alternatively, Defendants suggest the plain meaning of the statutory text and the structure of the TCPA support reading § 227(b) as the exclusive protection for cellphones. *See* Health Plan's Mot. to Dismiss. 12 ¶¶ 24–25. As discussed above, binding Fifth Circuit precedent has forecloses this argument. Separately, this reading contravenes the FCC's interpretation of the statute. It is well settled that courts must "give binding

Moreover, Defendants' reading of the phrase "residential numbers" would frustrate Congress' intent. When the TCPA was passed in 1991, Congress recognized that "[a]dvances in automated technology made it feasible for companies to execute large-scale telemarketing campaigns at a fraction of the prior cost, dramatically increasing customer contacts."[108] Just that year, approximately 300,000 solicitors were calling more than 18 million Americans every day.[109] As a leading sponsor described the situation:

> Computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall.[110]

In Congress' view, the only way to achieve that end was to completely ban certain automated calls, such as the ones Plaintiff received.[111] Accordingly, as Plaintiff's injury falls within the statute's scope, the court next considers whether this type of injury was actionable at common law.

The injury to Plaintiff's privacy interest has a historical analog: public nuisance.[112] At common law, a public nuisance is an "unreasonable interference with a right common to the

---

deference to permissible agency interpretations of statutory ambiguities because Congress has delegated to the agency the authority to interpret those ambiguities 'with the force of law.' *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013) (Roberts, C.J. dissenting) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)). The TCPA expressly directs the FCC "to prescribe implementing regulations." *Mims*, 565 U.S. at 371; *see also* TCPA § 227(b)(2). As the FCC is responsible for implementing the TCPA, its interpretation of the statutory text warrants deference unless it is clearly unreasonable. *See City of Arlington*, 569 U.S. at 296. The FCC has interpreted the TCPA "to allow wireless subscribers to benefit from the full range of TCPA protections." *See In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd 14014, 63 (F.C.C. June 26, 2003). Defendants have failed to show this interpretation is unreasonable.

[108] *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

[109] *AAPC*, 140 S. Ct. at 2344 (citing TCPA, §2, ¶¶ 3, 6, 105 Stat. 2394, note following 47 U.S.C. § 227).

[110] *Mims*, 565 U.S. at 384 (quoting 137 Cong. Rec. 30821-30822 (1991)).

[111] *Cranor*, 998 F.3d at 690.

[112] *Id*. at 691.

general public."[113]  Although nuisances could be abated through a public suit, historically, a

private suit could be brought to address a public nuisance if the plaintiff had suffered "damage

particular to him and not shared in common by the rest of the public."[114]

Plaintiff's privacy injury closely resembles public nuisance claims at common law.[115]

Like traditional infrastructures, public telecommunications infrastructure is available for general

public use.  As with roads, highways, and traditional infrastructure, the public has a right to use

public telecommunications infrastructure free from harassment.  However, Defendants' calls

congest telephone lines, both for the public and for Plaintiff in specific, who could not use his

cell phone as he wished while he was dealing with Defendants' robocalls.  Historically, a public

suit could be brought to abate a public nuisance and only specifically aggrieved individuals could

bring a private suit in their own name.  Similarly, the TCPA allows for abatement via a public

suit,[116] while also providing a cause of action for uniquely affected individuals.[117]  The court,

therefore, finds that the TCPA provides a statutory cause of action that closely resembles a

public nuisance action as it existed at common law.

Notwithstanding the statutory and historical inquiry, Defendants contend Plaintiff lacks

standing because he uses his phone for mixed purposes or, alternatively, because he is a serial

TCPA litigant.  Neither argument carries the day.  Even assuming he uses his phone for business

---

[113] *Id.* (quoting Restatement (Second) of Torts § 821B (Am. L. Inst. 1979)).

[114] *Id.* (quoting W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 90, at 643–44 (5th ed. 1984)).

[115] *See id.*

[116] *See* § 227(e)(6)(a) (authorizing public suits).

[117] *See* § 227(b)(3).

purposes,[118] Plaintiff's injury is nevertheless concrete.  Section 227(b)(1)(A)(iii) makes it unlawful "to make *any* call . . . to *any* telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service . . . ." (emphasis added).  The statute does not discriminate between how individuals use their phones; instead, liability is imposed based on the type of service to which the phone is assigned.[119] Plaintiff alleges a cellular telephone service, which falls neatly within the ambit of the TCPA. Nothing in the Act purports to sanction robocalls to cell phones that are used for business purposes.  In fact, the use of "any" suggests Congress' generalized concern about all robocalls to cellphones, even if the owner uses his personal cell phone to conduct business.

Furthermore, Plaintiff's prior TCPA actions do not immunize Defendants.  Citing *Stoops v. Wells Fargo Bank, N.A.*,[120] a district court opinion from the Third Circuit, Defendants argue Plaintiff "hopes for robocalls to make a profit from statutory damages," as evinced by the fact that he filed at least eight TCPA lawsuits in 2020.[121]  Essentially, Defendants characterize Plaintiff as a vexatious litigant who actually wants to receive calls that violate the TCPA.  The court disagrees with this characterization and rejects the argument.

At the onset, Defendants cannot cite any portion of the TCPA limiting the number of actions an aggrieved party may bring.  The TCPA prohibits "any person" from making "any call"

---

[118] On a motion to dismiss, the court must accept as true all of Plaintiff's well-pleaded factual allegations. *Arnold v. Williams,* 979 F.3d 262 n.1 (5th Cir. 2020).  Plaintiff expressly alleges that his phone "is not primarily used for any business purpose," but is instead for "personal, family, and household use."  Compl. ¶ 63.  The court must credit this allegation and thus declines Defendants' invitation to look past the pleadings and find that Plaintiff's phone is used primarily for business purposes.

[119] *Compare* § 227(b)(1)(A)(i) (prohibiting robocalls to "any emergency telephone line") *with* § 227(b)(1)(A)(iii) (prohibiting robocalls to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service").

[120] 197 F. Supp. 3d 782, 800 (W.D. Pa. 2016).

[121] Health Plan Mot. to Dismiss ¶ 21.

(subject to exceptions not relevant here) "to any telephone number" assigned to a cellular telephone service.[122]  For "each such violation," a person may bring a private suit for an injunction, statutory damages, or both.[123]  The capacious language belies Defendants' construction, suggesting instead that Congress did not limit how many actions an aggrieved individual may bring under the TCPA.

Moreover, the legislative history undercuts Defendants' argument.  As discussed above, in enacting the TCPA, Congress was reacting to a deluge of "intrusive, nuisance calls . . . from telemarketers" that rely on "automated technology . . . to execute large-scale telemarketing campaigns at a fraction of the prior costs, dramatically increasing customer contracts."[124]  It does not follow that Congress would limit a litigant's ability to seek judicial relief against an offending party just because the litigant previously vindicated their rights against a different defendant.  In fact, Congress seemingly recognized that technological advances have allowed telemarketers to harass millions of individuals daily at little cost to themselves.  From this concern of systematic harassment, it follows that an individual can seek redress "for each violation" of the TCPA, even if they have vindicated those rights on prior occasions.[125]

Neither the text nor the legislative history of the TCPA purports to limit Plaintiff's ability to bring actions under the Act.  The judiciary's limited role in our constitutional order prevents

---

[122] § 227(b)(1).

[123] § 227(b)(3).

[124] *AAPC*, 140 S. Ct. at 2335.

[125] *See* § 227(b)(3).

the court from fashioning one out of whole cloth.[126]  Accordingly, Plaintiff has alleged a cognizable injury-in-fact.

###### 3.    Subject-Matter Jurisdiction

Alternatively, Defendants argue the court lacks jurisdiction over any calls made before 2020.  Defendants cite *AAPC*, where the Supreme Court held the "government-debt exception" in § 227(b)(1)(A)(iii) is unconstitutional and severed this provision in 2020.  Since courts cannot enforce unconstitutional statutes, Defendants argue they cannot be liable under § 227 (b)(1)(A)(iii) for calls made before 2020.  In effect, Defendants ask the court to declare that the TCPA's robocall prohibition does not apply to any robocalls made between 2015 until 2020.

In support, Defendants cite several district court rulings holding that courts lack subject-matter jurisdiction to enforce § 227(b)(1)(A)(iii) for calls made while the statute was unconstitutional.[127]  With due respect to those courts that have found otherwise, the court disagrees with Defendants' argument, and concludes that it does have subject-matter jurisdiction over the call made before *AAPC* was announced.

Section 227(b)(1)(A)(iii) prohibits calls made:

> to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any

---

[126] Defendants rely heavily on *Stoops*.  The court is not bound by this case and does not find it instructive. *Stoops*  was decided at the summary judgment stage and the evidence revealed the plaintiff has purchased over forty cell phones that she stored in a shoebox for no other purpose than to "fish for accidental wrong number calls."  *See Stoops*, 197 F. Supp. 3d at 796.  In contrast, Plaintiff's phone is for "personal, family, and household use."  Compl. ¶ 63.  The court accepts this allegation as true, as it must, which renders *Stoops* inapposite.

[127] AFSLIC's Mot. to Dismiss 17 (citing *Creasy v. Charter Communs., Inc.*, 489 F. Supp. 3d 499 (E.D. La. 2020); *Lindenbaum v. Realgy, LLC*, No. 1:19 CV 2862, 2020 U.S. Dist. LEXIS 201572 (N.D. Ohio Oct. 29, 2020); *Hussain v. Sullivan Buick-Cadillac-GMC Truck, Inc.*, 506 F. Supp. 3d 1242 (M.D. Fla. 2020).   At least one of these courts has reconsidered the issue and since rejected Defendants' argument. *See Boisvert v. Carnival Corp.*, No. 8:20-cv-2076-30SPF, 2021 U.S. Dist. LEXIS 47397, at *5 (M.D. Fla. Mar. 12, 2021) ("[A]t the time this Court decided Hussain, there was little guidance on this issue and the only two courts to decide this matter concluded that the statute was unconstitutional. . . . [E]very [other] court to analyze this issue since *Hussain* has concluded that the TCPA remains valid. The Court, having the benefit now of reading all of these cases, agrees with this majority view.").

> service for which the called party is charged for the call, *unless such call is made solely to collect a debt owed to or guaranteed by the United States*;

On July 6, 2020, the Supreme Court held that the last clause, which contains the government-debt exception, is an unconstitutional content-based restriction on speech and severed the clause from the statute.[128]  Justice Kavanaugh, joined by Chief Justice Roberts and Justice Alito, delivered the plurality opinion. In total, six Justices—the plurality and Justices Sotomayor, Gorsuch, and Thomas—concurred to find the government-debt exception unconstitutional.[129] Seven Justices—the plurality and Justices Sotomayor, Kagan, Breyer, and Ginsburg—concurred that the government-debt exception clause was severable from § 227(b)(1)(A)(iii).[130]

No opinion won the approval of the majority of the Court.  While it is clear that a majority held the government-debt exception clause unconstitutional and a different majority held the clause severable, there is no authoritative opinion addressing whether severability was retroactive.  In doctrinal terms, *AAPC* did not answer the precise question of whether the robocall restriction is enforceable for calls made between 2015 and 2020, during which time the statute included the unconstitutional government-debt exception.

Seizing on this silence, Defendants argue severance operated purely prospectively.  That is to say, the robocall restriction in § 227(b)(1)(A)(iii) was unconstitutional until *AAPC* was decided and thus can only be enforced prospectively, i.e., for calls made after that date.  This reading of *AAPC* cannot be squared with well-settled principles of constitutional adjudication.  First, it is inconsistent with the principle that "an unconstitutional statutory amendment 'is a

---

[128] *AAPC*, 140 S. Ct. at 2344.

[129] *Id.* at 2343.

[130] *Id.*

23

nullity' and 'void' when enacted, and for that reason has no effect on the original statute."[131] Under this principle, the government-debt exception, even though void, was separate and independent from the robocall restriction. Second, Defendants' argument is inconsistent with the general rule that parties may be liable for violating the unsevered portion of an unconstitutional statute, even if they did so prior to the date of judicial severance.[132]

For example, in *United States v. Jackson*,[133] the Supreme Court severed an unconstitutional death penalty clause from a federal kidnapping statute. However, holding the death penalty clause unconstitutional did not invalidate convictions under the statute obtained prior to severance.[134] In other words, the constitutional provisions of the statute remained in operation, both prospectively and retroactively.

Similarly, the court finds that the government-debt exception can be retroactively severed from the robocall prohibition. In 1991, Congress passed the robocall prohibition.[135] In 2015, it added the government-debt exception to § 227(b)(1)(A)(iii), the section containing the robocall prohibition.[136] Congress added this exception against the backdrop of a fallback rule: if the

---

[131] *Id.* at 2353 (citing *Frost v. Corp. Com. of Okla.*, 278 U.S. 515, 526–27 (1929)); *see also Rivers v. Roadway Express*, 511 U.S. 298, 313 n.12 274 (1994) (explaining that a Supreme Court decision does not change the meaning of a statute, but rather determines what it has "always meant").

[132] *See Frost*, 278 U.S. at 526 ("Here it is conceded that the statute, before the amendment, was entirely valid. When passed, it expressed the will of the legislature which enacted it. Without an express repeal, a different legislature undertook to create an exception, but, since that body sought to express its will by an amendment which, being unconstitutional, is a nullity and, therefore, powerless to work any change in the existing statute, that statute must stand as the only valid expression of the legislative intent."); *see, e.g.*, *Wilson v. United States*, 398 F.2d 331 (5th Cir. 1968) (*per curiam*), *cert. denied*, 393 U.S. 1069 (1969) (affirming defendants' convictions under Federal Kidnapping Act after other portions of the statute were declared unconstitutional); *United States v. Miselis*, 972 F.3d 518, 547–48 (4th Cir. 2020) (affirming defendants' convictions under the Anti-Riot Act after other portions of the statute were declared unconstitutional).

[133] 390 U.S. 570 (1968).

[134] *See, e.g.*, *Wilson*, 398 F.2d 331 (5th Cir. 1968), *cert. denied*, 393 U.S. 1069 (1969).

[135] *AAPC*, 140 S. Ct. at 2344.

[136] *Id.*

exception was unconstitutional, the severability clause indicates the fallback rule was to nix the exception and keep the blanket ban.[137]

In fairness, as noted by Justice Gorsuch in his dissent and emphasized by Defendants, invalidating only the government-debt exception leads to an odd result:  between 2015 and 2020, those who made robocalls are liable, but those who made robocalls to collect government debt during this time are not.  On the face of it, at least, a holding to this effect "would wind up endorsing the very same kind of content discrimination we say we are seeking to eliminate."[138]

The full scope of liability for calls made between 2015 and 2020 is an open question.  The *AAPC* opinion does not squarely address this issue and, indeed, seems internally inconsistent.[139]  The Fifth Circuit has not weighed in, although Footnote 12 of the plurality opinion suggests one path forward:

> As the Government acknowledges, although our decision means the end of the government-debt exception, no one should be penalized or held liable for making robocalls to collect government debt after the effective date of the 2015 government-debt exception and before the entry of final judgment by the District Court on remand in this case, or such date that the lower courts determine is appropriate. On the other side of the ledger, *our decision today does not negate the liability of parties who made robocalls covered by the robocall restriction.*[140]

---

[137] *See id.* at 2349–51.

[138] *AAPC*, 140 S. Ct. at 2366 (Gorsuch, J., dissenting) (internal citations omitted);

[139] *See Trujillo v. Free Energy Sav. Co., LLC*, 2020 U.S. Dist. LEXIS 239730, 2020 WL 8184336, at *3 (C.D. Cal. Dec. 21, 2020) ("[F]ootnote [12] presents a paradox.").  Footnote 12 suggests that no one who relied on the unconstitutional exception should be penalized for making robocalls to collect government debt between 2015 and 2020 for notice concerns.  It also indicates that liability for other robocalls is not negated.  This result seems to reproduce the constitutional defect.  Allowing defendants to seek immunity under an unconstitutional exception for notice reasons, while imposing liability on everyone else would favor certain speech based on the content, i.e., whether it was related to the collection of a government debt.

[140] *AAPC*, 140 S. Ct. at 2355 n.12 (emphasis added).

Only three Justices endorsed this statement, but it is nevertheless persuasive.[141]  Furthermore, the final line flows from the plurality's severability analysis that was essential to the holding.  If the unconstitutional 2015 amendment was "'a nullity' and 'void' when enacted,"[142] it stands to reason that the original robocall restriction was not impacted by the subsequent addition of the unconstitutional government-debt exception.[143]

The majority of the district courts that have addressed this issue have reached the same conclusion.[144]  For example, in *Cano v. Assured Auto Grp., Sunpath, Ltd.*, Senior Judge Fish explained, when a court declares a law unconstitutional, "it finds that it is 'void and is as no law' from the day it is passed."[145]  The court must then decide "what *did* take effect," a question severability answers.  As applied by the *AAPC* plurality, the 2015 addition of the government-debt exception to § 227(b)(1)(A)(iii) was a nullity.[146]  The severability clause indicates Congress' judgment that any constitutional taint associated with the 2015 amendment should not

---

[141] *See Peake v. Ayobami (In re Ayobami)*, 879 F.3d 152, 155 (5th Cir. 2018) ("It is well established in this circuit that, although we are not bound by dicta, even of this court, dicta of the Supreme Court are, of course, another matter.") (cleaned up).

[142] *AAPC*, 140 S. Ct. at 2353 (quoting *Frost*, 278 U.S. at 526–27).

[143] The minority of district courts that have held the entire robocall prohibition unenforceable reason that the government-debt exception and robocall prohibition are "inextricably intertwined for the purposes of any reasonable analysis," such that it is unconstitutional to enforce the unamended statute but not the exception during the interim period. *See, e.g.*, *Van Connor v. One Life Am., Inc.*, No. 6:19-cv-03283-DCC, 2021 U.S. Dist. LEXIS 121008, at *9 (D.S.C. June 29, 2021) (citing *Cunningham v. Matrix Fin. Servs.*, 2021 U.S. Dist. LEXIS 62875, 2021 WL 1226618 (E.D. Tex. Mar. 31, 2021); *Lindenbaum*, 497 F. Supp. 3d at 290).

[144] *See, e.g.*, *Gunn v. Prospects DM, LLC*, No. 4:19CV3129 HEA, 2021 U.S. Dist. LEXIS 74746 (E.D. Mo. Apr. 19, 2021) (collecting cases); *Lerner v. AmeriFinancial Sols., LLC*, Civil Action No. GLR-20-965, 2021 U.S. Dist. LEXIS 86161, at *9 (D. Md. May 5, 2021) (collecting cases); *Bonkuri v. Grand Caribbean Cruises, Inc.*, No. 0:20-cv-60638-WPD, 2021 U.S. Dist. LEXIS 30940 (S.D. Fla. Jan. 19, 2021);

[145] No. 3:20-CV-3501-G, 2021 U.S. Dist. LEXIS 133338 (N.D. Tex. July 19, 2021).

[146] *AAPC,* 140 S. Ct. at 2353 ([A]n unconstitutional statutory amendment 'is a nullity' and 'void' when enacted, and for that reason has no effect on the original statute.") (quoting *Frost,* 278 U.S. at 528).

frustrate the robocall prohibition that existed since 1991.[147]  Consistent with Congress' views as expressed in the severability clause,  a better reading of the *AAPC* decision is that the Supreme Court severed the unconstitutional government-debt exception from the constitutional robocall prohibition to effectuate Congress' to limit robocalls, even though its desire to immunize government-debt collectors from TCPA liability was frustrated.

This approach is well supported in our jurisprudence and comports with common sense. Although it is true that § 227(b)(1)(A)(iii) unconstitutionally favored particular speech, justice does not require, as Justice Gorsuch argues,[148] that the entire statute be held enforceable.  "Put in common parlance, the tail (one unconstitutional provision) does not wag the dog (the rest of the codified statute or the Act as passed by Congress)."[149]  Instead, the appropriate remedy for the conferral of an unconstitutional benefit is for the government to be denied this exception, rather than raze a whole statute and deny the TCPA's protection to all individuals.  Accordingly, the court concludes it possesses subject-matter jurisdiction over the robocalls that predate *AAPC*.

### B.    Improper Aggregation

Defendants next attack the sufficiency of Plaintiff's pleadings.  They argue he impermissibly aggregates the conduct of the four separate defendants without attempting to apportion responsibility between them.[150]  For example, Plaintiff alleges "it was the Defendants

---

[147] *See id.* ("The text of the severability clause squarely covers the unconstitutional government-debt exception and requires that we sever it.").  Even if the TCPA's severability clause does not require this outcome, the presumption of severability would require it.  *See id.* ("[E]ven if there were no severability clause . . .  we would apply the presumption of severability as described and applied in cases such as *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010). And under that presumption, we likewise would sever the 2015 government-debt exception, the constitutionally offending provision.").

[148] *AAPC*, 140 S. Ct. at 2366 ("A severance remedy not only fails to help the plaintiffs, it harms strangers to this suit.") (Gorsuch, J., concurring in the judgment in part and dissenting in part.).

[149] *Id*. at 2351.

[150] *See* AFSLIC's Mot. to Dismiss 7–8.

behind the robocall with the prerecorded or artificial voice" without identifying which specific Defendant made the call.[151]  Because Plaintiff "lump[s] together all defendants, while providing no factual basis to distinguish their conduct," Defendants reason they have not been provided fair notice of the relevant facts as required by Rule 8.[152]

Plaintiff did not respond to this argument.  The court agrees that Plaintiff's shotgun allegations fail to distinguish between the four separate Defendants.  The court is also mindful of Plaintiff's status as a pro se litigant that lacks the benefit of discovery.  After careful consideration of the issue, the court finds that Plaintiff's factual allegations are sufficient.

Rule 8 requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[153]  This standard provides defendants with "fair notice of what the claim is and the grounds upon which it rests."[154]  While Plaintiff does not explicitly allege which Defendant made which call, he has provided enough facts to place Defendants on notice of his claims.

Plaintiff alleges a minimum of nine unwanted calls that he attributes to Defendants.  For at least seven of these calls, Plaintiff pleads the date and time the calls occurred, along with the numbers the calls were made from.  While Defendants may want more specific allegations, the court finds that Plaintiff has provided them with the required notice about what phone calls will be at issue in this case.

---

[151] *Id.* at 9 (quoting Compl. ¶ 38).

[152] *See id.* at 8 (quoting *Bowling v. Dahlheimer*, No. 4:18-CV-10-ALM-CAN, 2019 U.S. Dist. LEXIS 158369, at *7 (E.D. Tex. Aug. 7, 2019)).

[153] Fed. R. Civ. P. 8(a)(2).

[154] *Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 498 (5th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555).

Furthermore, the court finds that Plaintiff's sparse allegations in this regard are understandable. Defendants' calls came from fictitious phone numbers, and the agents refused to identify themselves. As a result, Plaintiff could not determine who was responsible for the calls or how to stop them. Consequently, Plaintiff answered a call and purchased a policy "to determine who was making the illegal robocalls,"[155] an allegation the court accepts as true. Thus, under Plaintiff's recitation, his sparse allegations reasonably flow from his inability to identify which defendant was responsible for which act before engaging in discovery.[156] For this reason, the court rejects Defendants' request to dismiss the complaint for improper aggregation.

### C. Vicarious Liability

Defendants next challenge Plaintiff's theory of agency.[157] Plaintiff contends that Defendants are either directly or vicariously liable because they are acting as agents for one another.[158] But Plaintiff does not "allege which Defendant is the principal or that any other Defendant is acting on the behalf of that unnamed principal," or any specific facts suggesting Defendants consented to an agency relationship or had the ability to control one another.[159]

---

[155] Compl. ¶ 36.

[156] Although this is a close call, the court is mindful of Plaintiff's status as a pro se litigant. Moreover, it is unclear whether Defendants face any prejudice. Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. The pleading must provide fair notice of their claims and the facts they are based upon. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). Although Rule 8 may sometimes require a plaintiff to identify what each defendant did, the fair notice requirement depends on the type of case at bar. *See Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1248 (10th Cir. 2008) ("the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context."). Here, Plaintiff has alleged the time, date, and phone number for each call that was received. Although he cannot identify which Defendant made which call, the specific details he has alleged are sufficient to put all Defendants on fair notice of the facts and circumstances giving rise to his action.

[157] *See* AFSLIC's Mot. to Dismiss 10.

[158] Compl. ¶¶ 58–61.

[159] AFSLIC's Mot. to Dismiss 10.

Thus, Defendants move to dismiss Plaintiff's claims to the extent they rely on a theory of agency.[160]

Although the TCPA does not speak to whether vicariously liability may be imposed, the FCC, which is responsible for implementing the Act, has ruled that "under federal common-law principles of agency, there is vicarious liability for TCPA violations."[161]  This interpretation is not unreasonable and therefore merits deference.[162]  The court analyses Plaintiff's theory of agency under common law standards.[163]

At common law, "agency" contemplates "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control."[164]  Traditionally, a party is not responsible for the acts of another party. Still, a party that has entered into an agency relationship may be vicariously liable for the actions of another.

An agency relationship can be based on express authority, apparent authority, or ratification.  Express authority exists when a principal authorizes an agent to perform specific tasks for the principal's benefit and is subject to its control.  Alternatively, apparent authority can create agency, such as when a third-party reasonably believes an actor has authority to act as an

---

[160] *Id.*

[161] *See In re Joint Petition Filed by Dish Network, LLC,* 28 FCC Rcd. 6574, 6582 (2013); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016) (assuming without deciding that TCPA allows for vicarious liability).

[162] *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014), *overruled on other grounds by* 577 U.S. 153, 168 (2016) ("Because Congress has not spoken directly to this issue and because the FCC's interpretation was included in a fully adjudicated declaratory ruling, the interpretation must be afforded *Chevron* deference.").

[163] *See United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 727 F.3d 343, 349 (5th Cir. 2013) ("When grappling with the standard for imposing vicarious liability in civil liability provisions, we look to the common law principles . . ..").

[164] *In re DISH Network, LLC*, 28 FCC Rcd 6574, 6586 (F.C.C. May 9, 2013) (quoting Restatement (Third) of Agency § 1.01).

agent and the belief is traceable to a manifestation of the principal."[165]  Finally, ratification may give rise to an agency relationship, such as when a principal ratifies the agent's acts "by knowingly accepting their benefits."[166]

Plaintiff concludes, without explaining, that Defendants "are vicariously liable under the theories of actual authority, apparent authority, and ratification . . . ."[167]  As Defendants correctly note, Plaintiff does not identify which Defendant is the principal, the agent, or who benefited from the robocalls.  Similarly, the Complaint does not suggest which, if any, of the Defendants assented to an agency relationship.

Nevertheless, the court reasonably infers the existence of an agency relationship amongst Defendants from the Complaint.  Plaintiff states Defendants "are liable parties as the direct beneficiar[ies] of the illegal telemarketing calls" because they "authorized a third-party telemarketer to generate prospective customers."[168]  This suggests at least one Defendant agreed to market another Defendant's insurance products.  Although it is unclear which Defendant made the calls and which Defendant sold the insurance products, it stands to reason that all parties to this transaction realized some commercial benefit from the telemarketing schemes, either in the form of increased business for the telemarketers or increased sales for the Defendants actually selling insurance protects.  Indeed, Plaintiff alleges the existence of undisclosed emails showing "that the beneficial parties who were gaining customers" as a result of the robocalls "were the Defendants."[169]  At the very least, this allegation suggests one Defendant was a principal that

---

[165] *Id.* (quoting Restatement (Third) of Agency § 2.03, cmt. c.).

[166] *Id.* (quoting Restatement (Third) of Agency § 4.01, cmt. d.).

[167] Compl. ¶ 58.

[168]*Id.* ¶¶ 59–61.

[169] *Id.* ¶ 60.

authorized other Defendants to make robocalls on its behalf or, alternatively, ratified the robocalls by accepting the benefits they yielded. Although Plaintiff stands to benefit from more detailed allegations, the allegations are not so sparse as to deny Defendants fair notice of Plaintiff's claims and the grounds from which they arise.

### D.    Consent

Valid consent is an affirmative defense that will preclude liability under § 227(b)(1)(A)(iii) of the TCPA and § 305.053 of the Texas Business and Commerce Code. Defendants claim Plaintiff expressly consented to these calls.[170] In support, they have submitted evidence—documents and an audio recording—indicating Plaintiff's consent.[171] They ask the court to consider this extrinsic evidence and dismiss Plaintiff's claims under a motion for summary judgment.[172]

First, Plaintiff denies having consented to receive Defendants' calls.[173] Second, he argues the calls he received exceeded the scope of his purported consent.[174] Third, his purported consent was withdrawn no later than October 16, 2019.[175] Fourth, Plaintiff suggests the consent form he signed is an unconscionable contract of adhesion, as "consent was forced as a condition or applying for coverage."[176] Finally, he reasons that Defendants tactically refuse to identify

---

[170] HealthPlan's Mot. to Dismiss ¶ 28.

[171] *See id.* at Ex. 6, Ex. 7.

[172] HealthPlan's Mot. to Dismiss ¶ 30.

[173] Compl. ¶ 49.

[174] Resp. ¶ 19 ("Defendants' authorization was limited to contacts regarding his account with MBK and did not authorize MBK or any of its agent . . . to contact Plaintiff for any of the subsequent sales calls initiated by Defendants.")

[175] Resp. 5¶ 21.

[176] *Isquith v. Middle S. Utils. Inc.*, 847 F.2d 186, 196 n. 3 (5th Cir. 1988).

themselves during the robocalls, unless and until a recipient waives any rights they possess under the TCPA.

The court declines to resolve this issue at this juncture. Rule 12(d) vests the court with discretion to convert a motion to dismiss to a motion for summary judgment upon proper notice to all parties.[177] Conversion is more likely when the non-pleading materials are comprehensive and will enable a rational determination of a summary judgment motion. Ordinarily, summary judgment occurs during or after the close of the discovery period.[178] This is consistent with Rule 12(d)'s notice requirement, which is intended to prevent the premature cut-off of discovery.[179] Conversion of a motion to dismiss is disfavored because it risks denying parties "full, fair, and wholly adequate opportunity for discovery."[180]

Defendants' consent argument implicates questions of contractual interpretation, contractual ambiguity, parole evidence, and whether to consider the facts and circumstances surrounding the contract's execution. These issues are more appropriately addressed on a motion for summary judgment with the benefit of a fully developed record.[181] Accordingly, the court declines to rule on this issue at this time.

---

[177] *See* Fed. R. Civ. P. 12.

[178] *See* Fed. R. Civ. P. 56(b) ("Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.").

[179] *Clark v. Tarrant Cnty*, 798 F.2d 736, 746 (5th Cir. 1986).

[180] *See id*. (holding conversion of a motion to dismiss into a motion for summary judgment was proper when the court accepted evidence outside the pleadings and the parties had a "full, fair, and wholly adequate opportunity for discovery."). *See also Benchmark Elecs., Inc. v. J.M. Huber Corp*., 343 F.3d 719, 726 (5th Cir. 2003) (holding the district court erred in treating a motion for judgment on the pleadings as a motion for summary judgment as discovery had not been conducted and the plaintiff did not have notice of the court's intent to convert the motion).

[181] *See Galderma Labs., L.P. v. Dimensional Healthcare, Inc.*, No. CIV.A.4:06CV822-Y, 2007 WL 1703445, at *3 (N.D. Tex. June 13, 2007) ("Because a motion to dismiss for the failure to state a claim requires the Court to make all reasonable inferences and to resolve all factual disputes in [the plaintiff]'s favor, the Court would need to conclude that the Agreement's provision unambiguously supports [the defendant]'s interpretation in order to

### E.    Sufficiency of the Complaint

#### 1.    Section 227(b)(1)(A)(iii) of the TCPA

Defendants next move to dismiss Plaintiff's TCPA claims, reasoning he failed to plead that Defendants relied on ATDS technology to place the calls.[182]  The TCPA's prohibition on robocalls applies to calls made "using any automatic telephone dialing system."[183]  The Act defines the term ATDS as "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and [which has the capacity] to dial such numbers."[184]

Recently, the Supreme Court expounded on the statutory definition of an ATDS in *Facebook, Inc. v Duguid*.[185]  Applying settled principles of statutory interpretation, the Court held that "Congress' definition of an autodialer requires that in all cases . . . the equipment in question must use a random or sequential number generator" whether to produce or store numbers.[186]  This definition necessarily excludes equipment that does not use a "random or

---

rule in [the defendant]'s favor. If the provision unambiguously supports [the plaintiff]'s interpretation or is ambiguous and can support either party's construction, then the Court must rule in [the plaintiff]'s favor."); *see also, e.g., Al-Saud v. Youtoo Media, L.P.*, No. 3:15- CV-3074-C, 2016 WL 7680712, at *2 (N.D. Tex. Aug. 23, 2016) (denying Rule 12(b)(6) motion to dismiss reasoning that any factual disputes or arguments about contract interpretation are more appropriately addressed at the summary judgment stage); *Gryphon Master Fund, L.P. v. Cheetah Oil & Gas, Ltd.*, No. 3:06-CV-0698-P, 2006 WL 8436987, at *3 (N.D. Tex. July 19, 2006) (denying Rule 12(b)(6) motion to dismiss, stating "the Court will not decide which interpretation of the contract is correct and will choose to give the Plaintiffs' interpretation the benefit of any doubt" and presuming that there was a breach, and further stating "a decision as to the true meaning of the disputed contractual term is inappropriate at the pleading stage and is appropriately addressed in a motion for summary judgment or at trial").

[182] AFSLIC's Mot. to Dismiss 9–10.

[183] § 227(b)(1)(A).

[184] § 227(a)(1).

[185] *See Facebook*, 141 S. Ct. at 1167.

[186] *Id.* at 1170.

sequential number generator" to store or produce numbers, such as automated systems that made "targeted, individualized" calls "to numbers linked to specific accounts."[187]

Citing *Facebook*, Defendants argue Plaintiff's Complaint does not reasonably suggest the use of ATDS technology.  Plaintiff claims "each call was sent by an ATDS."[188]  Defendants reason this is insufficient as Plaintiff must have "asserted a badge of ATDS, like dead-airtime, for the court to infer more than the mere possibility of misconduct."[189]  This position is not unsupported.  Other courts have relied on allegations that calls began with several seconds of silence[190] or that the calls were not targeted or individualized to draw the inference that defendants used ATDS technology.[191]

This case is easily distinguished from *Facebook*.  The issue before the Supreme Court was definitional.  The plaintiff in *Facebook* asserted a TCPA claim against Facebook for sending targeted, individualized texts to numbers linked to specific accounts.[192]  The Court endeavored to determine whether such targeted automated calls met the definition of ATDS.  The Court held they do not.[193]  As such, the pleadings clearly foreclosed the possibility that Facebook used

---

[187] *Id*. at 1168.

[188] Compl. ¶ 52; *see also* Compl ¶ 66 ("Defendants initiated multiple calls to Plaintiff's cellular telephone number using an automated telephone dialing system."); Compl. ¶ 88 ("The Defendants violated 47 U.S.C. 227(d) and 47 U.S.C. (d)(3) and 47 U.S.C. 227(e) by using an automated dialing system that does not comply with he [sic] technical and procedural standards under this subsection.")

[189] AFSLIC's Mot. to Dismiss 9–10.

[190] *Callier v. Greensky, Inc.*, No. EP-20-CV-00304-KC, 2021 U.S. Dist. LEXIS 126769, at *12 (W.D. Tex. May 10, 2021).

[191] *Libby*, No. 5:21-CV-197-DAE, 2021 U.S. Dist. LEXIS 140103, at *8; *Atkinson*, No. SA-21-CV-178-OLG, 2021 U.S. Dist. LEXIS 112396, at *3 (W.D. Tex. June 16, 2021); *accord Barry v. Ally Fin., Inc.*, No. 20-12378, 2021 U.S. Dist. LEXIS 129573, at *9 (E.D. Mich. July 13, 2021).

[192] *Facebook*, 141 S.Ct. at 1168.

[193] *Id*. at 1168–69.

ATDS technology. Here, there is no such definitional quandary. Plaintiff did not base his TCPA claim on the receipt of targeted calls.

To require Plaintiff to plead the specifics of the technology used to place harassing calls would raise the pleading standard for TCPA claims impermissibly high. To allege a violation of the TCPA, Plaintiff need only allege facts that reasonably suggest Defendants used ATDS technology to call Plaintiff.[194] Plaintiff claims Defendants relied on ATDS to call him on his cell phone. This puts Defendants on "fair notice of what the claim is and the grounds upon which it rests."[195] It also reflects the totality of information a recipient of unwanted automated calls can be reasonably expected to possess. As other courts have noted, it is impracticable to expect plaintiffs to plead specific facts about a telemarketer's technological processes before they have the benefit of discovery.[196]

The court does not read *Facebook* to require TCPA plaintiffs to plead "dead-airtime." Rather, the court understands the Supreme Court to have established that district courts evaluating a TCPA claim must engage with a question of material fact: whether the calls underlying the claim are attributable to a "random or sequential number generator." If they are not, then ATDS technology was not involved, and the claim fails as a matter of law. This is properly addressed on summary judgment. Accordingly, the court will not dismiss Plaintiff's claim under § 227(b)(1)(A)(iii) of the TCPA claims.

---

[194] *Ashcroft*, 556 U.S. at 678.

[195] *See Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 498 (5th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555).

[196] *E.g.*, *Atkinson v. Pro Custom Solar LLC*, No. SA-21-CV-178-OLG, 2021 U.S. Dist. LEXIS 112396, at *3 (W.D. Tex. June 16, 2021) (Garcia, C.J.) (crediting conclusory allegations concerning the use of ATDS because "[a]s a practical matter, no plaintiff will have personal knowledge of the defendant's telephone system at the pleadings stage. Only the defendant has that knowledge."); *Libby v. Nat'l Republican Senatorial Comm.*, No. 5:21-CV-197-DAE, 2021 U.S. Dist. LEXIS 140103, at *9 (W.D. Tex. July 27, 2021) (same).

2.    Section 227(c) of the TCPA

Defendants next move to dismiss Plaintiff's claim under § 227(c).[197]  Section 227(c)

directs the FCC to promulgate rules regarding creating, implementing, and enforcing a Do-Not-

Call registry.[198]  A person who received more than one call within any 12 months in violation of

§ 227(c) or the regulations promulgated thereunder has a private right of action.[199]

Plaintiff expressly alleges that Defendants violated § 227(c) because they do not have a

written do-not-call list and, relatedly, do not train their agents or employees to use a do-not-call

list.[200]  Defendants move to dismiss this claim, reasserting their argument that Plaintiff

impermissibly lumps together the Defendants and fails to plead a theory of vicarious liability.

As the court has rejected those arguments, it finds Plaintiff has stated a claim under § 227(c).

3.    Section 310.4(b)(1)(iii)(B) of the TSR

Defendants next argue that Plaintiff's claim under 16 C.F.R. § 310.4(b)(1)(iii)(B) of the

TSR fails because he cannot satisfy the amount-in-controversy requirement.  The Federal Trade

Commission ("FTC") promulgated the TSR pursuant to its authority under the Telemarketing

and Consumer Fraud and Abuse Prevention Act ("TCFAPA"), 15 U.S.C. § 6101 *et seq.*

However, the FTC's regulations are subject to an amount-in-controversy requirement imposed

by the organic statute:  a private cause of action under the TCFAPA, or any rules promulgated

---

[197] AFSLIC's Mot. to Dismiss 11.

[198] *Mims*, 565 U.S. at 373.   The National Do Not Call Registry is currently managed by the Federal Trade Commission.  *Id.* at 387 n.3.  (citing 15 U.S.C. § 6151 (2006); 16 CFR § 310.4(b)(1)(iii) (2011).

[199] § 227(c)(5).

[200] Compl. ¶¶ 53–54.

thereunder, is available only if the aggrieved individual claims at least "$50,000 in actual damages."[201]  Statutory and punitive damages cannot satisfy this requirement.[202]

Plaintiff does not expressly allege his actual damages, and, in any case, his Complaint does not reasonably suggest that his actual damages approach the $50,000 figure necessary to sustain his TSR claim.  Accordingly, the court dismisses Plaintiff's claims arising under the TSR without prejudice.

4.  Section 305.053 of the Texas Business & Commerce Code

Defendants next move to dismiss Plaintiff's claim under § 305.053 of the Texas Business & Commerce Code.[203]  As with the TCPA claim, Defendants contend Plaintiff has not alleged enough facts to sustain this claim.  Section 305.001 of the Texas Business & Commerce Code prohibits calls to devices if the caller "knows or should have known that the called number is a mobile telephone for which the called person will be charged for that specific call," and the "called person has not consented to the making of such a call."  Courts have interpreted § 305.053, which provides a cause of action for such violations, to provide a state analog to

---

[201] 15 U.S.C. § 6104(a); *see, e.g.*, *Shostack v. Diller*, 2016 U.S. Dist. LEXIS 30354, at *16 (S.D.N.Y. Mar. 8, 2016) ("[A] plaintiff must allege actual damages of $50,000 or more to sustain a [TSR] claim."); *Worsham v. Disc. Power, Inc.*, Civil Action No. RDB-20-0008, 2021 U.S. Dist. LEXIS 141842, at *16 (D. Md. July 29, 2021) ("In order to bring a case under the TSR, a plaintiff must allege actual damages in excess of $50,000.); *Lucas v. Telemarketer Calling from (407) 476-5670*, No. 1:12-cv-630, 2014 U.S. Dist. LEXIS 37659, at *24 (S.D. Ohio Mar. 20, 2014) (same).

[202] *See Shostack*, 2016 U.S. Dist. LEXIS 30354, at *17; *Worsham*, No. SAG-20-00193, 2021 U.S. Dist. LEXIS 46837, at *10.

[203] *See* AFSLIC's Mot. to Dismiss 13–14.

federal TCPA actions.[204]  The court has already found that Plaintiff has failed to state a violation

of TCPA.[205]  As such, the court finds Plaintiff has also stated a violation of § 305.053.[206]

> 5.    Section 302.101 of the Texas Business & Commerce Code

Finally, Defendants move to dismiss Plaintiff's claim under § 302.101 of the Texas

Business & Commerce Code.[207]  Section 302.101 states that a seller "may not make a telephone

solicitation from a location in this state or to a purchaser located in this state unless the seller

holds a registration certificate for the business location from which the telephone solicitation is

made."[208]  Essentially, this is a registration requirement.  However, this provision does not apply

to persons "who hold[] a license issued under the Insurance Code if the solicited transaction is

governed by that code."[209]

HealthPlan claims it is exempt from this registration requirement because it falls under

the Insurance Code exemption provided for in § 302.053(3).[210]  Likewise, AFSLIC claims the

---

[204] *See, e.g.*, *Brown v. Enter. Recovery Sys.*, No. 02-11-00436-CV, 2013 Tex. App. LEXIS 10658, at *17 (Tex. App.—Fort Worth Aug. 22, 2013) (holding that § 305.053, at a minimum, adopts the TCPA prohibitions); *David L. Smith & Assocs., L.L.P. v. Stealth Detection, Inc.*, 327 S.W.3d 873, 876 (Tex. App.—Dallas 2010); *Chambers v. Green Tree Servicing LLC*, No. 3:15-CV-1879-M-BN, 2017 U.S. Dist. LEXIS 94895, at *1 (N.D. Tex. June 20, 2017) ("Texas Business and Commerce Code § 305.053 provides a cause of action for violations of the TCPA, 47 U.S.C. § 227.").

[205] *See, supra* Part III.E.1.

[206] *See Callier v. Greensky, Inc.*, No. EP-20-CV-00304-KC, 2021 U.S. Dist. LEXIS 126769, at *15 (W.D. Tex. May 10, 2021); *Shields v. Gawk Inc.*, No. 3:18-CV-00150, 2019 U.S. Dist. LEXIS 69338, at *11 (S.D. Tex. Apr. 24, 2019); *Morris v. Hornet Corp.*, Civil Action No. 4:17-cv-00350, 2018 U.S. Dist. LEXIS 170945, at *20 (E.D. Tex. Sep. 14, 2018), *report and recommendation adopted in whole by* 2018 U.S. Dist. LEXIS 170693 (E.D. Tex., Oct. 3, 2018)

[207] AFSLIC's Mot. to Dismiss 12–13; Health Plan's Mot. to Dismiss 18–19.

[208] Tex. Bus. & Com. Code § 302.101(a).

[209] *Id.* § 302.053(3).

[210] HealthPlan's Mot. to Dismiss ¶¶ 39–40. *See* Tex. Bus. & Com. Code § 302.053(3) ("This chapter does not apply to . . . a person who holds a license issued under the Insurance Code if the solicited transaction is governed by that code.").

exemption.[211]  Plaintiff concedes this argument[212] and, therefore, the court dismisses Plaintiff's claims under § 302.101 against HealthPlan and AFSLIC.

MultiPlan and NCE move to dismiss this claim, albeit for different reasons.  They contend "Plaintiff has alleged no actual facts" suggesting either entity is a "seller" under Texas law or that they made telephone solicitations from a location within Texas or to a "purchaser" located in Texas.[213]

Section 302.001 defines a "seller" as "a person who makes a telephone solicitation on the person's own behalf."[214]  A "telephone solicitation" is further defines as "a telephone call" made "to induce a person to purchase, rent, claim, or receive an item."[215]  The Act instructs courts to apply the scheme liberally to protect persons "against false, misleading, or deceptive practices in the telephone solicitation business."[216]  Moreover, the statute places the burden of proving an exemption on the party "claiming the exemption" in civil proceedings.[217]

Plaintiff expressly alleges that the calls were placed to a prospective purchaser located in Texas.[218]  He also alleges these calls were made to induce the purchase of Defendants' products and services.  Although it is unclear what role MultiPlan and NCE played in the telemarketing scheme, it is not unreasonable to infer MultiPlan made the calls or somehow benefitted from

---

[211] AFSLIC's Mot. to Dismiss 12.

[212] Resp. ¶48.

[213] MultiPlan's Mot. to Join ¶ 7.

[214] Tex. Bus. & Com. Code § 302.001(5).

[215] *Id.* § 302.001(7).

[216] *Id.* § 302.003.

[217] *Id.* § 302.051.

[218] Compl. ¶ 6.

them. Indeed, this reasonable inference also supports Plaintiff's theory of agency. While MultiPlan and NCE may be able to contest their status as sellers on summary judgment, at this stage, Plaintiff has stated a claim under § 302.101 as to MultiPlan and NCE, but not as to AFSLIC and Health Plan.

## IV.    CONCLUSION

Accordingly, the court enters the following orders:

1.   It is **HEREBY ORDERED** that "Defendant American Financial Security Life Insurance Co.'s Motion to Dismiss Plaintiff's First Amended Complaint, Or In The Alternative, Motion to Stay" [ECF No. 25] and "Defendant Health Plan Intermediaries Holdings, LLC's Motion to Dismiss For Lack of Subject-Matter Jurisdiction And For Failure to State A Claim Upon Which Relief Can Be Granted" [ECF No. 26] are **GRANTED IN PART AND DENIED IN PART.**

2.   It is **FURTHER ORDERED** that Plaintiff's claim under § 310.4(b)(1)(iii)(B) of the TSR is **DISMISSED WITHOUT PREJUDICE**.

3.   It is **FINALLY ORDERED** that Plaintiff's claim under § 302.101 of the the Texas Business & Commerce Code is **DISMISSED** as to Defendants Health Plan Intermediaries Holdings, LLC, and American Financial Security Life Insurance Company.

**SIGNED AND ENTERED this <u>26th</u> day of August 2021.**

**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**